## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

In re:                                          )
                                                )
RENTZEL PUMP MANUFACTURING, LP,                 )          Case No. 22-10541-SAH
                                                )          (Chapter 11, Subchapter V)
        Debtor.                                 )
                                                )

## OKLAHOMA STATE BANK'S MOTION TO
## REMOVE DEBTOR IN POSSESSION OR, ALTERNATIVELY,
## TO CONVERT CASE TO CHAPTER 7, WITH BRIEF IN SUPPORT,
## NOTICE OF OPPORTUNITY FOR HEARING, NOTICE OF HEARING,
## AND CERTIFICATE OF SERVICE

### NOTICE OF OPPORTUNITY FOR HEARING

**Your rights may be affected. You should read this document carefully and consult with your attorney about your rights and the effect of this document.** If you do not want the court to grant the requested relief, or you wish to have your views considered, you must file a written response or objection to the requested relief with the clerk of the United States Bankruptcy Court for the Western District of Oklahoma, 215 Dean A. McGee Avenue, Oklahoma City, OK 73102, no later than 21 days from the date of filing of this request for relief. You should also serve a file-stamped copy of your response or objection on the undersigned movant/movant's attorney and any others who are required to be served. If no response or objection is timely filed, the court may grant the requested relief without a hearing or further notice.

The 21-day period includes the three (3) days allowed for mailing provided for in bankruptcy rule 9006(f).

### NOTICE OF HEARING
### (TO BE HELD IF A RESPONSE IS FILED)

**Notice is hereby given that if a response to this document is filed, the hearing on the matter will be held on <u>October 5, 2022, at 1:30p.m.</u>, in the 9th floor courtroom of the United States Bankruptcy Court for the Western District of Oklahoma, 215 Dean A. McGee Avenue, Oklahoma City, OK 73102. If no response is timely filed and the court grants the requested relief prior to the above-referenced hearing date, the hearing will be stricken from the docket of the Court.**

1805986

Oklahoma State Bank ("OSB"), by and through its undersigned counsel, hereby files this Motion to Remove Debtor in Possession or, Alternatively, to Convert Case to Chapter 7 (the "Motion").  In support of this Motion, OSB shows the Court as follows:

## I.     PRELIMINARY STATEMENT

The Debtor has filed a motion seeking the dismissal of its case.  Dismissal, however, is not in the best interests of creditors.  Rather, it would be in the creditors' best interest if the Debtor were removed as the debtor in possession such that the Subchapter V Trustee could complete the bankruptcy process.  Alternatively, the Debtor's case should be converted to chapter 7.

The relief requested herein is necessary and in the best interests of creditors because the Debtor has delayed its bankruptcy proceedings and used them for the benefit of its insiders.  Now, after creditors have expended significant time and resources in the bankruptcy, the Debtor has asked that the case be dismissed.  This evidences a complete lack of good faith.  The Debtor has also engaged in gross mismanagement of its estate and improper conduct with regard to its accounting and filings.  The Debtor should not be permitted to continue to abuse the bankruptcy process.

## II.     BACKGROUND

1.      On March 25, 2022 (the "Petition Date"), the Debtor filed its Voluntary Petition pursuant to subchapter V of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

2.      On May 5, 2022, OSB filed its proof of claim in the Debtor's bankruptcy case [POC 6] ("OSB's Claim").  OSB's Claim reflects that OSB holds a fully secured claim against the Debtor's estate in the amount of $3,877,454.82.

3.      On May 5, 2022, the Court entered the Final Order Granting Emergency Motion for Order Authorizing Use of Cash Collateral and Providing Post-Petition Liens [Doc. 50] (the "Cash Collateral Order.").   Pursuant to the Cash Collateral Order, OSB was granted a first priority lien on the Debtor's post-petition collateral, among other rights.

4.      On June 22, 2022, the Debtor filed a proposed Plan of Reorganization [Doc. 58].

5.      On July 19, 2022, OSB filed its Objection [Doc. 72] to the Plan.  Objections to the Plan were also filed by the Internal Revenue Service and SBA [Doc. 75], BancFirst [Doc. 76], the U.S. Trustee [Doc. 77], and First United Bank & Trust [Doc. 78].

6.      On July 26, 2022, the Debtor filed its Application to Continue Hearing [Doc. 84], requesting that the hearing on confirmation of the Plan be continued from August 16, 2022 to September 21, 2022.

7.      On July 26, 2022, OSB filed its Objection to the Debtor's request to continue the confirmation hearing [Doc. 86].

8.      On July 28, 2022, the Debtor filed its Motion to Strike Confirmation Hearing [Doc. 96], requesting that the hearing on confirmation of the proposed plan be stricken altogether.

9.      On August 16, 2022, the Court entered an Order [Doc. 120] on the Debtor's Motion to Strike Confirmation Hearing, ordering the Debtor to file an amended plan of reorganization no later than 1 week after the conclusion of the hearings resolving the claim objections filed by the Debtor.

10.     On August 22, 2022, the Debtor filed its Debtor's Motion to Dismiss Case 7 [Doc. 127] (the "Motion to Dismiss").

11.    Concurrently with the filing of this Motion, OSB is filing an objection to the Motion to Dismiss.

### III.    ARGUMENTS AND AUTHORITIES

**A.    The Debtor Should Be Removed as Debtor in Possession**

Bankruptcy Code section 1185 provides that on request of a party in interest, a court shall order that the debtor be removed as a debtor in possession "for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor . . . ." 11 U.S.C. § 1185(a).  In the event a debtor is removed as debtor in possession, the subchapter V trustee assumes the duties of operating the debtor's business.  11 U.S.C. § 1183(b)(5).  Here, cause exists to remove the Debtor from possession.

1.    ***Dishonesty.***   The Debtor has engaged in various forms of dishonest behavior designed to benefit the Debtor's insiders to the detriment of creditors.  These examples include the following:

- Unauthorized Postpetition Loans.  Mr. Rentzel has testified that since the Petition Date, the Debtor has received working capital from certain insiders, which Mr. Rentzel considers to be a loan.  *See* Exhibit 1, Randall Rentzel Depo. Tr. at 122:23-123:20 (Aug. 25, 2022).  Such loans were not approved by the Court.

- Failing to Disclose Receivables Owed By Affiliates.  The Debtor's most recent monthly operating report identifies intercompany receivables owed by various affiliates of the Debtor totaling more than $1.7 million.  *See* Monthly Operating Report for July 2022, Balance Sheet (Page 18 of 44) [Doc. 135].  These receivables were not disclosed in the Debtor's schedules.  Mr. Rentzel testified that

4

he is unsure of what these receivables even are.  *See* Exhibit 1, Randall Rentzel Depo. Tr. at 85:7-23 (Aug. 25, 2022).

- <u>Failing to Disclose Insider Transactions</u>.  Within the year before the Petition Date, Mr. Rentzel's daughter and son-in-law were both employed by the Debtor.  *See* Exhibit 1, Randall Rentzel Depo. Tr. at 82:22-83:5 (Aug. 25, 2022).  Yet, the Debtor's Statement of Financial Affairs failed to disclose payments to these insiders.  *See* Statement of Financial Affairs, Part 30 [Doc. 43].  The Debtor also made distributions to Mr. Rentzel within the year prior to the Petition Date which were not disclosed in the Statement of Financial Affairs.  *See* Exhibit 1, Randall Rentzel Depo. Tr. at 94:22-95:19 (Aug. 25, 2022).

- <u>Filing Amended Schedules Without Sufficient Support</u>.  On April 24, 2022, the Debtor filed its Schedule of Assets [Doc. 43].  On June 28, 2022, the Debtor filed Amended Schedules [Doc. 63], which significantly reduced the claimed value of the Debtor's assets.  Mr. Rentzel testified that the amended values came from him, but that he did not know how such values were calculated.  *See* Exhibit 1, Randall Rentzel Depo. Tr. at 64:10-65:2 (Aug. 25, 2022) (stating he did not recall where the amended accounts receivable numbers came from).  As to other amendments, Mr. Rentzel testified that they were based on a guess by him.  *See* Exhibit 1, Randall Rentzel Depo. Tr. at 70:7-14 (Aug. 25, 2022).

These amended schedules are directly contradicted by the Debtor's monthly operating reports.

2.      ***Incompetence.***  To the extent the Debtor's actions outlined above fail to rise to the level of dishonesty, they were certainly incompetent.  Given the myriad of issues with the Debtor's pre- and postpetiton conduct, cause exists to remove the Debtor from possession.

3.      ***Gross Mismanagement.***  In the context of Bankruptcy Code section 1185, courts have found that examples of gross mismanagement include delays in taking steps to reorganize, inadequate accounting, and the filing of a facially unconfirmable plan.  *See, e.g.*, *In re Young*, No. 20-11844-T11, 2021 WL 1191621, *6 (Bankr. D.N.M. Mar. 26, 2021).  Here, the Debtor has significantly delayed its reorganization, failing to negotiate in good faith with creditors.  These delays included the filing of a patently unconfirmable plan and waiting a significant period of time before filing objections to proofs of claim.  The Debtor's accounting and record keeping has also been deficient, with the Debtor filing monthly operating reports and schedules that contradict one another, and also filing amended schedules that change the value of assets without any basis.  Thus, the Debtor has grossly mismanaged its estate.

There are substantial grounds justifying removing the Debtor from possession.  The Debtor has mismanaged its estate, engaged in questionable practices and self-dealing, and failed to advance this case at a reasonable pace.  The Debtor is not acting in the best interests of creditors, and it would benefit parties in interest for the subchapter V trustee, who is already familiar with the Debtor and its operations, to assume control of the Debtor and this case.  Accordingly, the Debtor should be removed from possession.

6

**B.**    **Alternatively, this Case Should Be Converted to Chapter 7**

Bankruptcy Code section 1112(b) provides

> Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b)(1).  Here, both cause exists for conversion and conversion would be in the best interests of creditors and the estate.

*i.*    *Cause exists for conversion of the Debtor's case to chapter 7.*

Bankruptcy Code section 1112(b) provides for a non-exhaustive list of examples of "cause." 11 U.S.C. § 1112(b)(4).  These examples include the following:

1.    ***Substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation (11 U.S.C. § 1112(b)(4)(A)).***  The Debtor continues to suffer ongoing losses.  While the Debtor has shown moderate monthly profits, such profits are only possible due to the Debtor's failure to satisfy debts owed to creditors.  The Debtor also continues to incur legal fees and other administrative expenses.  The Debtor has further shown an unwillingness to reorganize and is now seeking to dismiss its own case.  These actions indicate that the Debtor does not have a reasonable likelihood of rehabilitation.

2.    ***Gross mismanagement of the estate (11 U.S.C. § 1112(b)(4)(B)).***  As set forth above, the Debtor has grossly mismanaged its estate by delaying taking steps to reorganize, inadequate accounting, and the filing of a facially unconfirmable plan.

3.    ***Failure to file or confirm a plan within the time fixed by the Bankruptcy Code (11 U.S.C. § 1112(b)(4)(J)).***  Bankruptcy Code section 1189(b) provides that a

debtor in a subchapter V case must file a plan not later than 90 days after the order for relief unless extended by the court. 11 U.S.C. § 1189(b). Here, although the Debtor filed a plan within the 90 day period, such plan was facially not confirmable. Such placeholder plans are strongly disfavored as they do not represent Congress's intent in enacting the Small Business Restructuring Act. *In re Baker*, 625 B.R. 27, 37 (Bankr. S.D. Tex. 2020). The Debtor's failure to file a plan that has even a chance at being confirmed within the 90 day period constitutes cause for conversion.

### ii. Conversion is in the best interests of creditors.[1]

Bankruptcy Code section 1112(b) provides that if cause is established, the court shall convert the case to chapter 7 or dismiss the case, whichever is in the best interests of creditors and the estate, unless the court determines that appointment of a trustee or examiner under section 1104(a) is in the best interests of creditors and the estate. 11 U.S.C. § 1112(b)(1).[2] Whether to dismiss or convert a case "falls within the sound discretion of the court." *In re Sandia Resorts, Inc.*, 562 B.R. 490, 495 (Bankr. D.N.M. 2016) (citing *Loop Corp. v. U.S. Trustee*, 379 F.3d 511, 515 (8th Cir. 2004)).

As recounted by the Bankruptcy Appellate Panel of the Tenth Circuit in *In re Gollaher*, Nos. UT-11-019, 10-30065, 2011 WL 6176074, *3-4 (B.A.P. 10th Cir. Dec. 13, 2011), courts consider the following factors in determining whether conversion, as opposed to dismissal, is in the best interests of creditors:

     1.    ***Whether some creditors received preferential payments, whether equality of distribution would be better served by conversion rather than dismissal.*** This factor

---

[1] The following argument, in substantially the same form, was included in OSB's objection to the Debtor's Motion to Dismiss.

[2] Bankruptcy Code section 1104 is not applicable to subchapter V cases. 11 U.S.C. § 1181(a).

weighs in favor of conversion. Multiple creditors in this proceeding, including OSB, BancFirst, the SBA, and the IRS have filed claims asserting interests in the Debtor's assets, some of which interests potentially overlap. If this case were to be dismissed, each of these creditors, among others, would be in a race to obtain judgment in various state court proceedings. There would also be danger that the Debtor would prefer certain creditors. This risk is heightened by the fact that the Debtor's principal, Randall Rentzel, allegedly faced potential criminal liability to the IRS. Mr. Rentzel testified that he has already paid a portion of the IRS's claim because "I just don't want to go to prison." *See* Exhibit 1, Randall Rentzel Depo. Tr. at 150:9-151:15 (Aug. 25, 2022). It is foreseeable that should this case be dismissed, the Debtor would prefer certain creditors over others, furthering the need for the protections afforded creditors by bankruptcy.

2. ***Whether there would be a loss of rights granted in the case if it were dismissed rather than converted.*** This factor weighs in favor of conversion. In exchange for OSB's agreement to allow the Debtor to use OSB's cash collateral, the Court entered an order providing various protections to OSB, including adequate protection payments, periodic reporting, priority liens, and the potential for a diminution claim. *See* Final Order Granting Emergency Motion for Order Authorizing Use of Cash Collateral and Providing Post-Petition Liens [Doc. 50]. Those rights would likely be lost upon dismissal. Further, OSB and other creditors depend on other informational rights and oversight afforded by the Bankruptcy Code and Bankruptcy Rules, including periodic reports. Without these protections, creditors will be left in the dark as to the Debtor's dealings.

3.      *Whether the debtor would simply file a further case upon dismissal.*
This factor weighs in favor of conversion.  The Debtor commenced this case to stay the
various litigation matters pending against it.  Should the case be dismissed, and the
parties are forced back into state court, there would be nothing to stop the Debtor from
merely filing another bankruptcy case should the Debtor determine that the state court
litigation was not going favorably.

4.      *The ability of the trustee in a chapter 7 case to reach assets for the
benefit of creditors.*  This factor weighs in favor of conversion.  A trustee would have the
ability to independently assess claims and asserted interests, resolve the same, and
efficiently make distributions to creditors.  Conversely, dismissal would result in a
multitude of state court actions, with creditors making competing claims and racing to a
judgment.  Avoiding such unequal and inefficient proceedings is a primary purpose of
bankruptcy.

5.      *In assessing the interest of the estate, whether conversion or dismissal of
the estate would maximize the estate's value as an economic enterprise.*  This factor
weighs in favor of conversion.  The Debtor is involved in two separate multi-year civil
cases pending in Oklahoma state courts.  *See* Statement of Financial Affairs, Part 3 [Doc.
43].  The Debtor has cited to the litigation as one factor that contributed to its decision to
file for bankruptcy.  *See* Debtor's Plan of Reorganization, Page 2 [Doc. 58] ("But, as a
result of the OSB matter, Debtor has been forced to restructure its business . . . .").
Should this case be dismissed, the state court litigation will recommence, putting the
Debtor back in the same position it faced prior to bankruptcy.  Comparatively, the parties
have been working through the claim allowance process, which should resolve many of

the issues pending in that litigation.  Thus, continuing the bankruptcy will allow the Debtor to avoid significant legal expenses, thereby maximizing the value of the Debtor's business.

6.    ***Whether any remaining issues would be better resolved outside the bankruptcy forum.***  This factor weighs in favor of conversion.  There are a multitude of creditors, several of which have competing claims to the same assets.  Prior to the Petition Date, the Debtor had multiple lawsuits pending against it.  Bankruptcy presents a much more attractive forum for resolving these issues than various state court proceedings.  The universe of claims against the Debtor is currently known, as the bar date has passed.  Further, the Debtor has filed its objections to claims, which are set for hearing.  Thus, the remaining issues are on the cusp of being resolved.  It would be wholly inefficient to abandon this proceeding at this late juncture and force the parties to go back to state court.

7.    ***Whether the estate consists of a "single asset."***  This factor weighs in favor of conversion.  This is not a single asset matter, and this is not a two-party dispute. Accordingly, this is not a situation where a state court could resolve the issues as easily as the bankruptcy court.

8.    ***Whether the debtor had engaged in misconduct and whether creditors are in need of a chapter 7 case to protect their interests.***  This factor weighs in favor of conversion.  The Debtor has engaged in various forms of misconduct since this case was commenced, necessitating a trustee to protect creditors' interests.  Examples of the Debtor's misconduct include the following:

- Unauthorized Postpetition Loans. Mr. Rentzel has testified that since the Petition Date, the Debtor has received working capital from certain insiders, which Mr. Rentzel considers to be a loan. *See* Exhibit 1, Randall Rentzel Depo. Tr. at 122:23-123:20 (Aug. 25, 2022). Such loans were not approved by the Court.

- Failing to Disclose Receivables Owed By Affiliates. The Debtor's most recent monthly operating report identifies intercompany receivables owed by various affiliates of the Debtor totaling more than $1.7 million. *See* Monthly Operating Report for July 2022, Balance Sheet (Page 18 of 44) [Doc. 135]. These receivables were not disclosed in the Debtor's schedules. Mr. Rentzel testified that he is unsure of what these receivables even are. *See* Exhibit 1, Randall Rentzel Depo. Tr. at 85:7-23 (Aug. 25, 2022).

- Failing to Disclose Insider Transactions. Within the year before the Petition Date, Mr. Rentzel's daughter and son-in-law were both employed by the Debtor. *See* Exhibit 1, Randall Rentzel Depo. Tr. at 82:22-83:5 (Aug. 25, 2022). Yet, the Debtor's Statement of Financial Affairs failed to disclose payments to these insiders. *See* Statement of Financial Affairs, Part 30 [Doc. 43]. The Debtor also made distributions to Mr. Rentzel within the year prior to the Petition Date which were not disclosed in the Statement of Financial Affairs. *See* Exhibit 1, Randall Rentzel Depo. Tr. at 94:22-95:19 (Aug. 25, 2022).

- <u>Filing Amended Schedules Without Sufficient Support</u>.    On April 24, 2022, the Debtor filed its Schedule of Assets [Doc. 43]. On June 28, 2022, the Debtor filed Amended Schedules [Doc. 63], which significantly reduced the claimed value of the Debtor's assets.  Mr. Rentzel testified that the amended values came from him, but that he did not know how such values were calculated.  *See* Exhibit 1, Randall Rentzel Depo. Tr. at 64:10-65:2 (Aug. 25, 2022) (stating he did not recall where the amended accounts receivable numbers came from).  As to other amendments, Mr. Rentzel testified that they were based on a guess by him.  *See* Exhibit 1, Randall Rentzel Depo. Tr. at 70:7-14 (Aug. 25, 2022). These amended schedules are directly contradicted by the Debtor's monthly operating reports.

9.      ***Whether a plan has been confirmed and whether any property remains in the estate to be administered.***  This factor weighs in favor of conversion.  While no plan has been confirmed, there is property to be administered.  If the case is dismissed, that property would be under the control of the Debtor with no oversight.  It is in the best interests of all parties for a trustee to oversee the administration of that property.

10.      ***Whether the appointment of a trustee is desirable to supervise the estate and address possible environmental and safety concerns.***  This factor weighs in favor of conversion.  The appointment of a trustee is necessary for a multitude of reasons.  The Debtor has shown an unwillingness to attempt to negotiate a plan in good faith.  The Debtor has also engaged in troubling conduct both before and during the pendency of this

case, placing the interests of insiders above those of creditors. There is sufficient cause to remove the Debtor as debtor in possession and allow a trustee to complete the bankruptcy process.

11.     ***The preferences expressed by creditors.***  The final factor courts consider is "the preferences expressed by creditors for either dismissal or conversion as they are the best judge of their own best interests." *Gollaher*, 2011 WL 6176074, at *4.  As is evident, OSB supports conversion.  This factor, accordingly, weighs in favor of conversion.

As shown herein, each of the relevant factors weighs in favor of conversion of this case. Accordingly, this case should be converted to chapter 7.

## IV.     CONCLUSION

WHEREFORE, OSB respectfully requests this Court enter an order (a) removing the Debtor from possession or, alternatively, converting this case to chapter 7; and (b) granting such other and further relief as the Court deems appropriate.

Respectfully submitted,

*/s/ Clayton D. Ketter*
Melvin R. McVay, Jr., OBA #6096
Clayton D. Ketter, OBA #30611
PHILLIPS MURRAH P.C.
Corporate Tower, Thirteenth Floor
101 North Robinson Avenue
Oklahoma City, Oklahoma  73102
405.235.4100 – telephone
405.235.4133 – facsimile
mrmcvay@phillipsmurrah.com
cdketter@phillipsmurrah.com
**Attorneys for Oklahoma State Bank**

## **CERTIFICATE OF SERVICE**

This is to certify that on the 9th day of September, 2022, true and correct copies of the foregoing motion were mailed by first class mail, postage prepaid, to all parties on the attached service list.

*/s/ Clayton D. Ketter*
Clayton D. Ketter, OBA #30611

Label Matrix for local noticing
1087-5
Case 22-10541
Western District of Oklahoma
Oklahoma City
Fri Sep  9 12:51:38 CDT 2022

BancFirst
c/o Crowe & Dunlevy, P.C.
324 N. Robinson Ave
Suite 100
Oklahoma City, OK 73102-6417

Blackwood Law Firm, PLLC
PO Box 6921
Moore, OK 73153-0921

First United Bank & Trust
P O Box 130
Durant, OK 74702-0130

Mitchell & Hammond
512 N.W. 12 th Street
Oklahoma City, OK 73103-2407

On Deck Capital Inc.
101 West Colfax Ave
10th Floor
Denver, CO 80202-5167

Rentzel Pump Manufacturing, LP
PO Box 721927
Norman, OK 73070-8470

United States ex rel., Internal Revenue Serv
210 Park Ave, Ste 400
Oklahoma City, OK 73102-5602

United States, ex rel. Small Business Admini
210 Park Ave, Ste 400
Oklahoma City, OK 73102-5602

USBC Western District of Oklahoma
215 Dean A. McGee
Oklahoma City, OK 73102-3426

Aubrey Thrasher, LLC
1170 Peachtree St.  Ste. 1925
Atlanta, GA 30309-7677

BancFirst
Shawnee
1939 Harrison St.
Shawnee, OK 74804-4028

BancFirst, an Oklahoma State
Banking Corporation
Joel Harmon
324 N Robinson Ave Suite 100
Oklahoma City OK 73102-6417

Crowe & Dunlevy
324 N. Robinson Ave.
Oklahoma City, OK 73102-6416

First United Bank & Trust
Spend Life Wisely Co
1400 W. Main St.
Durant, OK 74701-4906

First United Bank and Trust Co
William Riley Nix, Atty for First United
717 N Crocket St.
Sherman, TX 75090-4979

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346

Mee, Mee, Hoge & Epperson
Attn: John W. Mee III
1900 NW Expy Ste. 1400
Etna, WY 73118-1801

Mitchell & Hammond
Mitchell & Hammond
512 N.W. 12th Street
Oklahoma City, OK 73103-2407

Nix Law Firm
Attn: William Riley Nix
717 N. Crockett St.
Sherman, TX 75090-4979

Oklahoma State Bank
OSB Norman
2122 W. Main St.
Norman, OK 73069-6460

(c)OKLAHOMA STATE BANK
C/O MELVIN R. MCVAY, JR.
PHILLIPS MURRAH P.C.
101 N ROBINSON AVE FL 13
OKLAHOMA CITY OK  73102-5523

On Deck Capital
Attn: Bankruptcy
1400 Broadway 25th Floor
New York, NY 10018-5225

On Deck Capital, Inc.
1400 Broadway
New York, NY 10018-5300

Phillips Murrah, PC
Corporate Tower, 13th Floor
101 N. Robinson
Oklahoma City, OK 73102-5504

Rentzel Properties, LLC
4608 Flintridge Drive
Norman, OK 73072-4469

SBA
Little Rock CLSC
2120 Riverfront Dr. Ste. 100
Detroit, MI 72202-1794

U.S. Small Business Administration
200 W. Santa Ana Blvd., Ste 740
Santa Ana, CA 92701-7534

(p)U S  SMALL BUSINESS ADMINISTRATION
500 POYDRAS STREET SUITE 828
NEW ORLEANS LA 70130-3374

United States Trustee
United States Trustee
215 Dean A. McGee Ave., 4th Floor
Oklahoma City, OK 73102-3479

```
WSP USA Inc.                              Wells Fargo Bank NA                 Amanda R Blackwood
Attn: Cary M Siegel, Asst. Secretary & S  Attn: SBA                          Blackwood Law Firm, PLLC
One Penn Plaza                            1 Home Campus MAC X2303-01A 3rd Floor  PO Box 6921
250 W. 34th Street                        Des Moines, IA 50328-0001          512 NW 12th Street
New York, NY 10119-2104                                                      Oklahoma City, OK 73103
                                                                             Moore, OK 73103-2407

Gary D. Hammond                           Steven M Rutherford
512 NW 12th Street                        Steve M. Rutherford CPA, P.C.
Oklahoma City, OK 73103-2407              4812 East 81st St.
                                          Ste 302
                                          Tulsa, OK 74137-1920
```

The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).

```
U.S. Small Business Administration
301 NW 6th Street
Suite 116
Oklahoma City, OK 73102
```

Addresses marked (c) above for the following entity/entities were corrected
as required by the USPS Locatable Address Conversion System (LACS).

```
Oklahoma State Bank
c/o Melvin R. McVay, Jr.
Phillips Murrah P.C.
101 North Robinson, Suite 1300
Oklahoma City, OK  73102
```

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

```
(u)Oklahoma State Bank          (d)Rentzel Pump Manufacturing, LP      End of Label Matrix
                                   PO Box 721927                       Mailable recipients   34
                                   Norman, OK 73070-8470               Bypassed recipients    2
                                                                       Total                 36
```

```
 1                  IN THE UNITED STATES BANKRUPTCY COURT
                   FOR THE WESTERN DISTRICT OF OKLAHOMA
 2

 3     In re:

 4     RENTZEL PUMP MANUFACTURING, LP,

 5                                      No. 22-10541-SAH

 6     Debtor.

 7


 8

                      EXAMINATION OF RANDALL RENTZEL
 9             TAKEN ON BEHALF OF OKLAHOMA STATE BANK
                  ON AUGUST 25, 2022 AT 9:45 A.M.
10                  IN OKLAHOMA CITY, OKLAHOMA

11

12                            APPEARANCES

13     On behalf of OKLAHOMA STATE BANK:
       Clayton D. Ketter
14     Melvin R. McVay
       PHILLIPS MURRAH
15     Corporate Tower, Thirteenth Floor
       101 North Robinson
16     Oklahoma City, Oklahoma  73102
       405.235.4100
17     cdketter@phillipsmurrah.com

18     On behalf of the DEBTOR:
       Gary D. Hammond
19     MITCHELL & HAMMOND
       512 NW 12th Street
20     Oklahoma City, Oklahoma  73103
       405.216.0007
21     gary@okatty.com

22


23


24     (Appearances continued on the following page)

25     REPORTED BY:   Abby Rhodes, CSR, RPR
```

EXHIBIT
1

1   what I've learned the value was after that, so we've

2   corrected it.

3       Q    And are you referring to the machinery when

4   you say that?

5       A    I'm referring to the machinery, I'm

6   referring to the inventory, and the receivables.

7       Q    Well, let's tackle the receivables first.

8   It's on page 4 of 17, item No. 11.

9       A    Yes.

10      Q    And we just looked at the debtor's original

11  schedules that had listed accounts receivable has

12  having a total value of $313,108.44; correct?

13      A    Correct.

14      Q    And the amended schedules lower the value

15  just $42,568.12; correct?

16      A    That is correct.

17      Q    Explain why that change was made.

18      A    Well, because we made the correction to the

19  uncollectible, uncollectible accounts, and as far as

20  the face amount, I don't know if the face amount of

21  the under 90 days reflects the amount of receivables

22  of -- as of the date of the amended filing or if it

23  relates back to the original filing date.

24      Q    So you don't know how the 25,660.72 was

25  arrived at?



```
 1        A    I don't recall.  I mean, obviously, it came

 2   from me, but I don't recall specifically that.

 3        Q    In looking at the original schedules, we

 4   discussed the, the accounts receivable that are

 5   90 days old or less; correct?

 6        A    Correct.

 7        Q    And attached to those original schedules is

 8   an exhibit that was taken from the debtor's books and

 9   records that showed an itemization of the accounts

10   receivable; correct?

11        A    Correct.

12        Q    And it showed accounts receivable 90 days

13   old or less of being $58,815; correct?

14        A    I believe that's correct.

15        Q    How is it that that number has now been

16   close to halved in the amended, amended schedules?

17        A    Well, because we may have collected on the

18   difference in receivables.  I mean, that happens all

19   the time.

20        Q    So is it your testimony, then, that the

21   $25,000 is the number of accounts receivable 90 days

22   old or less as of June 28, 2022?

23        A    I would assume that, but I don't know.

24        Q    And the accounts receivable over 90 days old

25   would be amended schedules.  It's listed a face amount
```

1    last month, we sold some scrap at eight cents a pound.

2    We've -- a year ago, it was four cents a,

3    four-and-a-half cents a pound.  That's, what, that's

4    less than $20,000 of value at scrap value.  So the 90,

5    in my opinion, is a very generous value at scrap

6    value.

7        **Q    And so the $90,000 listed in these amended**

8    **schedules is the scrap value of the inventory, is what**

9    **you believe?**

10        A    I believe that it is somewhat based on the

11   scrap value.  You have to pick -- you have to pick

12   your, your valuation; right, and, and again, I don't

13   know what the total weight of the inventory is.  I can

14   only guess.

15       **Q    Did you come up with the $90,000?**

16       A    I did.

17       **Q    And what did you guess was the weight of the**

18   **inventory in performing that calculation?**

19       A    I don't recall, but I wouldn't have used --

20   I was surprised that the current rate is eight cents.

21   I would have used four and a half to five cents to, to

22   do that.

23       **Q    So I won't make you do the math as you sit**

24   **here, but if we were to take an estimated price of**

25   **four to five cents, is that per pound?**



```
 1        A    For the debtor and for the affiliates.

 2        Q    You mentioned being blocked on the

 3   government's website.

 4             What do you mean by that?

 5        A    Apparently, when you have a SBA lawsuit,

 6   then you don't get to play with the government

 7   anymore.

 8        Q    If you'll turn to page 72 of 87, item No. 4

 9   lists "Payments or other transfers of property made

10   within one year before filing this case that benefited

11   any insider."

12        A    Yes.

13        Q    It lists payments to you of 84,000 and

14   payments to your wife of 36,000; correct?

15        A    Correct.

16        Q    There's no listed payments to your daughter,

17   though; correct?

18        A    Doesn't look like it.

19        Q    And did she receive payments during that

20   period from the debtor?

21        A    I don't know.

22        Q    And there's also no listed payments to your

23   son-in-law; correct?

24        A    It's not -- there are no payments listed,

25   that's correct.
```

1     Q    And did he receive payments from the debtor

2  one year before filing the case?

3     A    He's -- yeah, I mean, he's still on the

4  payroll.  I don't know.  I'll have to read your

5  definition of who should have been listed, but...

6     Q    I've handed you what's been marked as

7  Exhibit No. 8 to your examination.

8           (Exhibit 8 Marked for Identification)

9     A    Okay.

10     Q    It's the initial debtor report filed in the

11  bankruptcy case on April 22, 2022, docket No. 42.

12     A    Okay.

13     Q    Have you reviewed this document before?

14     A    I don't recall reviewing it but I obviously

15  signed it.

16     Q    Looking at page 2 of 50 of this document,

17  that's your signature?

18     A    Yes.

19     Q    And you declared under penalty of perjury

20  that the information contained there in attachments

21  are true and correct to the best of your knowledge and

22  belief; correct?

23     A    That's right.

24     Q    If you'll turn to the page number that's at

25  the top, page 6 of 50.

1    correct?

2         A    And they were to the best of my knowledge.

3         Q    **And to the best of your knowledge and**

4    **belief, is the balance sheet accurate?**

5         A    To the best of my knowledge and belief, the

6    balance sheet is accurate.

7         Q    **And this shows under Other Current Assets a**

8    **number of inner-company receivables; is that correct?**

9         A    It does.

10        Q    **What is PSM?**

11        A    Pump Systems Management.

12        Q    **And there's an intercompany receivable owed**

13   **by PSM of over $1 million; correct?**

14        A    It appears to be that way.

15        Q    **What does that receivable stem from?**

16        A    Those are intercompany loans, basically.

17        Q    **So the debtor made loans to PSM?**

18        A    I don't believe that that's correct.  I

19   don't know if this was receivables going back and

20   forth or transfers.  I don't know.

21        Q    **You don't know what that million-dollar line**

22   **item is?**

23        A    No.

24        Q    **It's obviously a fairly sizable asset listed**

25   **on here.**

1  because she didn't have an RPM credit card.  And she

2  purchased things for, to manufacture the pumps and the

3  products.  Unbeknownst to us, when she did that, she

4  would make an entry to show that she had paid it by

5  credit card.  Okay?

6           Well, the bill goes to the, the Norman

7  office.  The Norman office was doing the same thing.

8  So essentially, we were doing it twice.  So instead of

9  it coming off, it just kept growing, so in recent

10  months, we've taken steps to correct that.  The

11  downside of that is that it artificially inflates our

12  income and reduces our loss because it goes to income

13  because you're, you're backing out that expense that

14  you did twice.

15       Q    And so you've been making accounting entries

16  to correct that on the books?

17       A    That is correct.  And if you look at your

18  more recent P&L and balance sheets, you'll see that.

19       Q    And is that the same for all of the credit

20  cards that are listed?

21       A    That is the same for all the credit cards.

22       Q    Moving down to the equity portion of the

23  balance sheet, there's a line item for shareholder

24  distribution.

25       A    Yes.



```
 1        Q     Of 1.3 million and change.

 2        A     Correct.

 3        Q     What is that?

 4        A     That's a cumulation of distributions to me.

 5        Q     And over what time period were those

 6   distributions made?

 7        A     Eighteen years.

 8        Q     Starting from when you acquired the company

 9   to the present?

10        A     Correct.

11        Q     When was the last time a distribution was

12   made?

13        A     I have no idea.

14        Q     Was it within --

15        A     Not recently.

16        Q     Was it within the past year?

17        A     Probably within the last year, but certainly

18   not recently.  Not in the last six months, I would

19   say, but I don't know.

20        Q     The last distribution that you would have

21   received from the debtor, what was the approximate

22   amount?

23        A     I don't have a clue.

24        Q     More than $10,000?

25        A     I don't know.
```

1   **has asserted counterclaims against Oklahoma State**

2   **Bank, hasn't it?**

3        A    Yes.

4        **Q    And the debtor claims damages in excess of**

5   **$5 million; correct?**

6        A    Yes.

7        **Q    Why did the debtor file for bankruptcy?**

8        A    Because the president at the time, Jim

9   Canton, threatened to put me into bankruptcy if I

10   didn't do certain things that he wanted me to do that

11   I was not obligated to do.

12            So sure enough, over the time, because OSB

13   has made us toxic to all the other lenders.  Companies

14   work on -- survive on working capital, and if you

15   can't get a bank loan, you're in trouble.  And so

16   through -- since 2018, our position has deteriorated

17   because of Oklahoma State Bank's actions.

18        **Q    And was there a specific event that prompted**

19   **the debtor to file for bankruptcy when it did?**

20        A    Well, that's a cumulative collateral damage

21   event, you know, we can -- you can only do so much

22   with no working capital; right?

23        **Q    Does the debtor currently have access to**

24   **working capital?**

25        A    The debtor has working capital from its

```
1    owners and we have changed the way to the -- to the

2    degree that we can get our customers to give us

3    progress payments so that we can buy the inventory and

4    the raw materials, we get progress payments in advance

5    with the customer's orders.

6        Q    And working capital from the owners, when

7    was that first provided to the debtor?

8        A    It's been for years.

9        Q    From an accounting standpoint, how was that

10   noted whenever that occurs?

11       A    Well, one way is a -- I prefer it be in the

12   form of a loan formally, but also, I think it's a

13   loaner's equity.  It goes to owner's equity.  If I

14   give them the money, if Rentzel Properties gives them

15   the money, then it should go to a loan to Rentzel

16   Properties.

17       Q    Has the debtor -- has the -- have the owners

18   assisted the debtor with working capital needs since

19   the bankruptcy was filed?

20       A    Probably.

21       Q    And have the owners assisted the debtor with

22   working capital needs going back four years at least?

23       A    Oh, I'm sure.

24       Q    You mentioned progress payments from

25   customers.
```



1           MR. HAMMOND:  I want to make sure I

2   understand, Clay.  This is the original PPP

3   application?

4           MR. KETTER:  Correct.  Not the EIDL loan

5   application that we looked at.  The two PPP loans.

6           THE WITNESS:  I think we need to just get

7   with First United Bank and see if they can send us

8   copies of them.

9      **Q    (By Mr. Ketter) The delinquent payroll taxes**

10  **owed by the debtor to the IRS.**

11     A    Yes.

12     **Q    Are the delinquent taxes both the employer's**

13  **portion and the withholding portion that are**

14  **outstanding?**

15     A    You're referring to the trust fund account?

16     **Q    Yes.**

17     A    Okay.  So since filing the bankruptcy, we

18  have personally paid off the trust fund portion, which

19  was about 100 and, I'm rounding off here, $138,000.

20     **Q    And when you say "personally," who do you**

21  **mean personally paid those?**

22     A    My funds or my wife and I's funds.

23     **Q    Your individual funds?**

24     A    Yes.

25     **Q    And so all that's remaining now is the**

1   non-trust fund portion --

2        A    That is correct.

3        Q    The payment by you and your wife of the

4   trust fund portion, have you characterized that as a

5   loan to the debtor?

6        A    I have not.

7        Q    How do you characterize that?

8        A    Well, I need to get with my CPA and see how

9   to treat that.  I don't know.  That's a -- right now,

10  my CPA is up to his eyeballs in corporate tax returns,

11  so we have not gone there yet.

12       Q    Do you expect to be repaid that money by the

13  debtor?

14       A    I have not gone down that road yet.  I just

15  don't want to go to prison.

16       Q    Have you received any notices from the IRS

17  in the past 12 months regarding those delinquent

18  taxes?

19       A    We've been working with the IRS very

20  closely, yes.

21       Q    We'd ask for any of those notices that the

22  debtor has received be provided to us.

23       A    Okay.

24            MR. HAMMOND:  I want to make sure I'm

25  understanding what you're asking.  IRS notices for the

